UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CASHMAN SCRAP & SALVAGE, L.L.C. | CIVIL ACTION |
| VERSUS | NUMBER 07-7068 |
| BOIS D'ARC ENERGY, INC., ET AL. | SECTION "L" (3) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### 1. PROCEDURAL HISTORY

This case involves a suit for an alleged breach of contract. Bois d' Arc ("BdA") owned and/or operated a natural gas field in the Gulf of Mexico near the mouth of the Mississippi River known as the Main Pass 21 facility ("MP 21"). Hurricane Katrina caused significant damage to MP 21. BdA entered into a contract with Cashman Scrap & Salvage, LLC ("Cashman") to supply barges in connection with BdA's endeavor to repair MP 21. Cashman supplied the barges and billed BdA. Cashman claims it has not been paid the full amounts agreed upon under the terms of the contract and has sued BdA to recover the outstanding balance. BdA claims that the contract is null and void because of fraud and misrepresentation and that Cashman has been fully paid for the services it rendered. Additional parties to this litigation are OPE, Inc. ("OPE"), a company that BdA retained to supply engineering and project managing services, and Timothy Lee ("Lee") who was an employee of OPE and Trendsetter Resources, LLC ("Trendsetter"), a company wholly owned be Lee. These parties have also asserted various cross-claims and counter-claims, including (i) a claim by Trendsetter and Lee against Cashman for breach of contract. Trendsetter and Lee assert that they are owed $148,500.00 plus interest for unpaid commissions; and (ii) a claim by OPE against Trendsetter and Lee for unjust enrichment; and (iii) various claims for indemnification by BdA against OPE, Trendsetter, and Lee.

This matter came on for trial without a jury on March 11 and ended on March 14, 2009. After considering the testimony of the witnesses, the exhibits admitted into evidence and the briefs submitted by the parties, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that a Finding of Fact constitutes a Conclusion of Law, the Court adopts it as such. And to the extent that a Conclusion of Law constitutes a Finding of Fact, the Court also adopts that as such.

**FINDINGS OF FACT**

(1)

Cashman is a Louisiana Limited Liability Company with its principal office in Baton Rouge, Louisiana. Trendsetter is a limited liability company organized under the laws of Texas with its principal place of business in Texas but is authorized to do and does business within the jurisdiction of this Court. OPE is a corporation organized under the laws of Texas with its principal place of business in Texas but is authorized to do and does business in the jurisdiction of this Court. BdA is a Nevada corporation with its principal place of business in Texas but is authorized to do and does business within the jurisdiction of this Court.

(2)

BdA owned and/or operated a natural gas field in the Gulf of Mexico, near the mouth of the Mississippi River which was known as MP 21. Hurricane Katrina badly damaged the wells, pipelines and adjoining structures of this facility. Sometime after the hurricane BdA decided to repair MP21.

(3)

In May of 2006 BdA had been laboring at MP 21 for several months and was seeking a new project manager and/or construction manager to act as its on-site representative who would

supervise and coordinate the project and, in general, assure that work was being done in the most efficient and economical manner.

(4)

At that time Rich Smiley was the BdA employee in charge of the MP 21 project. In May of 2006 Smiley spoke to Farlyn Bowen, a business acquaintance, then employed by Halliburton. During this conversation, Smiley expressed BdA's multiple needs for vessels, various service providers and a project manager for MP 21. In response Bowen suggested that he contact Timothy Lee.

(5)

A short time later, Smiley and Lee made contact by phone and Lee followed up with an e-mail on May 25, 2006 wherein he provided information concerning his affiliation with Trendsetter, his role as broker for Cashman and his ability to locate and retain a barge spread for the MP 21 job. In this e-mail Lee signed off as "Timothy Lee, Managing Partner of Trendsetter Resources-Independent broker for Cashman Barge & Equipment Co." In addition he furnished Smiley with Cashman's website. Lee, acting for Trendsetter as broker for Cashman, advised Cashman of BdA's barge needs and suggested to Brian Jones, Cashman's Vice President, that he contact BdA's employee, Smiley, and ascertain their specific needs and submit a proposal. At this same time Lee was an employee of OPE which is a company that provides engineering and project managing services to companies doing work in the offshore oil field industry. In fact Lee had been rehired by OPE in January of 2006.

(6)

In late June of 2006 BdA entered into a Master Service Agreement with OPE whereby OPE agreed to provide project management services for the rebuilding of the MP 21 facility.

OPE assigned its employee, Lee, as OPE's project manager for this project. Part of a project manager's job is to locate and secure barges and equipment for the client's project at the most economical price.

(7)

In his capacity as project manager for OPE Lee received Cashman's quote for providing the barge spread for the work at the MP 21 project. Cashman gave Lee a price of $15,000 a day for the vessel spread. Lee then suggested to Cashman that they contact BdA directly and negotiate a proposal of $20,000 per day which would include a $5,000 commission for Lee's company Trendsetter. The Cashman quote was not to include any reference to the commission. Lee sent Cashman a "Confidential" Brokerage Agreement to be signed between Cashman and Trendsetter whereby Cashman agreed to pay Trendsetter a commission of $5,000 per day on the construction barge provided to BdA and $500 per day on the material barge provided to BdA. Lee, then in his capacity as OPE's project manager, approved the $20,000 proposal. Thereafter, Cashman and BdA entered into a Master Time Charter Agreement whereby Cashman agreed to provide personnel and equipment to BdA for the MP 21 project at a rate of $20,000 per day for the construction barge, and a rate on the material barge of $5000 per day while in the field and $3,500 per day while on standby. Cashman did not inform BdA that the day rates included a $5,000 and $500 per day commission to Lee's company Trendsetter.

(8)

In late November of 2006 OPE discovered Trendsetter's brokerage fees and immediately informed BdA that its employee, Lee, was making an unauthorized commission off of equipment provided to BdA by Cashman as well as three other subcontractors. (BdA short paid the invoices of the other three subcontractors, Madcon, APA Fabricators, and Crossmar, none of

which have resulted in a dispute or litigation).  OPE, thereafter, fired Lee.

(9)

On November 27 and 29, 2006, after being fired, Lee sent correspondence to Cashman informing Cashman that he resigned from OPE and that OPE had informed BdA that "his personal company was making money off the project" and that the Confidential Brokerage Agreement between Cashman and Trendsetter was "confidential and still in effect" and "unless they audit you (Cashman) that information should not come up."

(10)

In December 2006 BdA short paid Cashman's last set of invoices in the amount of $632,500.00 totaling the amount BdA had paid for Trendsetter's commissions.  Cashman sued BdA to recover the amount withheld and this dispute spawned the present litigation.

**CONCLUSIONS OF LAW**

(1)

This Court has jurisdiction under Title 28, United States Code, Section 1333. Alternatively, the Court has jurisdiction pursuant to Title 28, United States Code, Section 1332 (pursuant to which all parties stipulate any party's alleged damages exceed $75,000 exclusive of interest and costs).  Additionally, to the extent applicable, this Court possesses supplemental and ancillary jurisdiction pursuant to Title 28, United States Code, Section 1367.  Venue is not contested.  The applicable substantive law is the General Maritime Law of the United States because the claims result from the Master Time Charter between Cashman and BdA, a maritime contract that contains a choice of law provision selecting maritime law to govern the contract.

(2)

Cashman claims that it had a valid contract with BdA to supply a barge spread for the MP 21 project for an agreed upon price and BdA breached this contract by failing to pay the full amount agreed upon. In response, BdA claims that it is not bound by the contract because Cashman made material misrepresentations or nondisclosures which voided the contract ab initio. Federal courts sitting in admiralty traditionally apply common law factors to determine if fraud or misrepresentations have been made in consummating a contract sufficient to void the contract. *Black and Gold Marine, Inc. v. Jackson Marine Co. Inc.*, 759 F.2d 466, 470 (5th Cir. 1985); *Elmwood Dry Dock and Repair v. H & A Trading Co. Ltd*, No. 93-2156, 1997 WL 781298, at *21 ( E.D. La. Dec. 16, 1997). The following elements are traditionally required to prove fraud or misrepresentation at common law: (1) the deceiving party made a material misrepresentation or nondisclosure, (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be, (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts, (4) the deceiving party intended the deceived party to rely on misrepresentations or nondisclosure, (5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure. *Black and Gold Marine*, 759 F.2d at 470; *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1120 (5th Cir. 1984). At common law courts require litigants asserting fraud to prove fraud allegations by clear and convincing evidence. *See Vogel v. American Warranty Home Serv. Corp.*, 695 F.2d 877, 882 (5th Cir. 1983).

(3)

BdA fails to carry its burden to prove fraud sufficient to void its contract with Cashman. The weight of the evidence supports the conclusion that BdA through its employee, Rich Smiley,

either knew or certainly should have known that Lee was acting for Trendsetter as Cashman's broker at the same time he was acting as a project manager for OPE. Smiley received the May 26th e-mail which clearly indicated that Lee was acting as "Managing Partner of Trendsetter - Independent broker for Cashman." Smiley testified that this e-mail and other things raised "red flags" that he missed, overlooked, or disregarded. Further, in this industry it is customary for a barge broker to receive a commission from the barge owner. Smiley admits that he knew this. Clearly, BdA should have known that Lee was in effect acting in a dual capacity and receiving payment for each role, but BdA, nevertheless, entered into a contract with Cashman. They did it because it was favorable to BdA. The day rate and terms set forth in the contract were reasonable even though the rate included Lee's commission. In fact the day rate was less than BdA had paid on previous occasions or would pay when Cashman's barge spread was replaced with another. Moreover, Smiley testified that the services provided by Cashman under the contract were satisfactory.

(4)

BdA was not the only one who knew or should have known that Lee was acting in a dual capacity. Cashman certainly knew it and, of course, Lee knew it. But nothing in the credible evidence supports the conclusion that OPE knew or should have known that their employee was acting in two roles. When OPE found out about it, they immediately told their customer, BdA, and then fired Lee.

(5)

Since BdA knew or should have known that Lee was acting in a dual capacity, they are obligated to fulfill the terms of their contract with Cashman. Furthermore, because BdA knew or should have known of this fact, it is not entitled to indemnification from OPE, Trendsetter, or

Lee for damages incurred as a result of the contract.

(6)

The evidence clearly shows that Cashman was aware of Lee's dual capacity at the time they paid him a commission. In fact, they were aware of Lee's role even prior to making payments when Lee then suggested to Cashman that they contact BdA directly and negotiate a proposal of $20,000 per day which would include a $5,000 commission for Lee's company Trendsetter. Thus, they were aware of Lee's dual capacity at the time they entered into the contract, and accordingly, their agreement to pay a commission of $5,000 per day should be enforced.

(7)

At this point it is appropriate to focus on the claims involving Lee and his company, Trendsetter. Claims for unjust enrichment are cognizable under admiralty law. *Kane v. Motor Vessel LEDA*, 355 F. Supp. 796, 801 (E.D. La. 1972). Under Louisiana law, five elements must be satisfied in order to establish a claim for unjust enrichment: "(1) an enrichment of the defendant, (2) an impoverishment of the plaintiff, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for either the enrichment or the impoverishment, and (5) no other remedy available at law." *Aqua-Terra Constr. and Eng'g Sys. v.Oak Harbor Inv. Props., L.L.C.*, No. 06-1864, 2008 WL 3539728, at *3 (E.D. La. July 31, 2008).

(8)

In this case, the weight of the evidence supports the conclusion that Lee and Trendsetter were unjustly enriched at the expense of OPE. As an employee of OPE, Lee was assigned to act as project manager for the rebuilding of the MP 21 facility. In this role, Lee was responsible for

securing barges for the project. Thus, when Lee brokered the deal between BdA and Cashman, he was acting as an employee of OPE. By keeping a personal commission for performing this duty of his employment with OPE, Lee was clearly enriched at the expense of OPE, and there was no cause for this enrichment.

(9)

Under Louisiana law, a court may pierce the veil of an LLC when a shareholder is an alter ego of the LLC and "fraud or deceit has been practiced on a third party by the shareholder acting through the corporation." *Kingsman Enters., Inc. v. Bakerfield Elec. Co.*, 339 So. 2d 1280, 1282 (La. Ct. App. 1976).

(10)

In this case, Lee was the sole shareholder for Trendsetter. All activities of Trendsetter were executed by Lee and only Lee. His deceitful actions, which were unknown to OPE, led to the unjust enrichment of himself and Trendsetter at the expense of OPE. Accordingly, the Court finds that it is appropriate to pierce the corporate veil and hold both Lee and Trendsetter liable to OPE for their unjust unrichment. OPE is entitled to payment of the $5,000 per day commission throughout the entire duration of the contract.

## IV. PRE-JUDGMENT INTEREST

In admiralty cases, although an award of prejudgment interest is discretionary with the court, such interest is normally awarded unless specific circumstances are present that would make the award inequitable. *See Probo II London v. Isla Santay M/V*, 92 F.3d 361, 363-64 (5th Cir. 1996). The rate of prejudgment interest, as well as the date from which it accrues, is also discretionary with the court. *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-21 (4th ed.). "The essential rationale for awarding prejudgment interest is to ensure that an injured party

is fully compensated for its loss.... [P]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195-97, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995). Prejudgment interest is appropriate in cases of mutual fault, and "denying prejudgment interest on the basis of mutual fault would seem to penalize a party twice for the same mistake. Such a double penalty is commended neither by logic nor by fairness...." *Id.* at 199 (citing *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789. Given the facts of the instant case, the Court finds that an award of prejudgment interest at the rate of 5.5% per annum from the date of judicial demand is appropriate.

## V.  SUMMARY

The evidence establishes that Timothy Lee was acting in a dual capacity as he worked on rebuilding the MP 21 facility. While he was serving as the project manager for OPE, Lee, as owner of Trendsetter, was also acting as barge broker for Cashman. This dual capacity gave rise to a conflict of interest for Lee. BdA clearly knew or should have known of Lee's dual capacity. Accordingly, BdA's contract with Cashman must be enforced. Cashman, who paid Lee's personal commission, certainly knew of Lee's dual role both at the time they agreed to pay the commission and when they entered into their contract with BdA. Accordingly, Cashman's contract with Lee and Trendsetter must also be enforced. OPE, on the other hand, did not know and could not reasonably have known of Lee's misconduct until after work on the the MP 21 project was ongoing. In November of 2006, when OPE discovered that Lee was receiving a personal commission from Cashman, they immediately fired Lee and informed BdA. Because Lee was an employee of OPE while he received the personal commission, Lee and Trendsetter were unjustly enriched at the expense of OPE.

For the foregoing reasons, IT IS ORDERED that:

(1) BdA shall be liable to Cashman for the amount that they short-paid the contract, $632,500.00, plus costs and prejudgment interest at the rate of 5.5% per annum from the date of judicial demand;

(2) Cashman shall be liable to Lee and Trendsetter for the amount of unpaid commissions under their contract, plus costs and prejudgment interest at the rate of 5.5% per annum from the date of judicial demand;

(3) Timothy Lee and Trendsetter shall be liable to OPE for the entire amount of commissions collected and due to be collected over the life of the contract, plus costs and prejudgment interest at the rate of 5.5% per annum from the date of judicial demand.

At this time, the Court is unable to calculate the precise amount that Cashman owes Lee and Trendsetter and the precise amount that Lee and Trendsetter owe to OPE. Accordingly, the parties are directed to meet and confer in an attempt to determine these amounts. If successful, the parties shall submit a proposed judgment to the Court no later than Monday, October 12, 2009. If the parties are unable to agree upon the amounts prior to the deadline, then they are directed to contact the Court and the Court will convene a hearing to resolve the issue.

New Orleans, Louisiana, this 28th day of September, 2009.

_____
UNITED STATES DISTRICT JUDGE